BOYCE F. MARTIN, Jr., Circuit Judge.
 

 Macomb County Bank appeals the district court’s order affirming the bankruptcy court’s decision which found the bank in contempt of an automatic stay entered pursuant to 11 U.S.C. § 362(a) and which assessed damages against the bank for its willful violation of that stay. We reverse and remand.
 

 On July 12, 1985, David Leland Archer and Mildred Kaye Archer filed a joint petition for protection from creditors under Chapter 11 of the United States Bankruptcy Code. Pursuant to the petition, the Archers were appointed debtors in possession for all purposes allowed under the Bankruptcy Code. One of the assets of the bankruptcy estate is a 60-acre farm on which the couple manage a horse breeding and training business. The farm is subject to a first mortgage held by the bank.
 

 Upon the filing of the Archers’ voluntary bankruptcy petition, the bankruptcy court issued an automatic stay order against all of the Archers’ creditors. Such a stay prohibits any further collection proceedings
 
 *498
 
 without prior approval of the bankruptcy court. 11 U.S.C. § 362. Pursuant to the Bankruptcy Code, notice of the filing of the petition and of the automatic stay was mailed to all of the Archers’ creditors, including the bank which was listed in the bankruptcy schedules and on the mailing matrix used by the bankruptcy court to address envelopes in which the notices were mailed.
 

 The bank, though, apparently ignored this notice. In January 1986, more than five months after the Archers filed for bankruptcy, the bank began foreclosing on the mortgage by publishing a notice of foreclosure sale in a local newspaper. Shortly thereafter, the Archers’ attorney contacted the bank and demanded that the foreclosure proceedings and publications be stopped immediately. The bank refused this request, allowing publication of the announcement of the mortgage foreclosure sale on three subsequent occasions.
 

 Finally, on February 11, 1986, the Archers turned to the bankruptcy court for relief. The following day the bankruptcy court issued an order to show cause, and it set a hearing for February 28, 1986. Only at the hearing did the bank submit a written response to the Archers’ motion, and the bank produced no witnesses to support its response to either the show cause order or to the Archers’ claim for damages.
 

 After hearing from the respective counsel, the bankruptcy court found that the bank violated the automatic stay order. Then, after denying the bank’s request to postpone the hearing, the bankruptcy court allowed the Archers to establish the amount of business that was lost as a result of the bank’s misconduct. The bankruptcy court then concluded that the Archers lost 10 breeding contracts at $950 each and nine training contracts each worth $300 per month for 12 months. Including attorneys’ fees in the amount of $1,942.50, the total award entered in favor of the Archers was $43,842.50.
 

 The bankruptcy court’s findings were affirmed by the district court, and the bank now renews its appeal in this court.
 

 The bank essentially advances two arguments. First, the bank maintains that the bankruptcy court committed reversible error by immediately conducting a hearing on the issue of damages when it had only received notice of a hearing regarding its alleged contempt of the automatic stay. Second, the bank argues that the evidence offered by Archer was insufficient to support the amount of damages awarded by the bankruptcy court. While we do not believe the bankruptcy court erred by receiving testimony on the issue of damages at the show cause hearing, we are convinced that the amount of damages awarded lacks a sufficient factual foundation.
 

 The bank claims that the bankruptcy court’s refusal to postpone the damages hearing effectively violated its constitutional right to due process because the bank had not received notice that such a hearing was going to take place. This argument is untenable for several reasons.
 

 First, the title of the Archers’ motion to show cause, a motion which was sent to the bank more than two weeks before the hearing was held, indicated that they were seeking damages and attorneys’ fees, and the motion itself contained specific allegations regarding the losses suffered as a result of the bank’s deliberate misconduct. Moreover, the bank’s written response was entitled “Answer To Motion For Order To Show Cause Why Defendant Should Not Be Held In Contempt of Automatic Stay Order Issued Pursuant to 11 U.S.C. 362(a)
 
 And For Damages And
 
 Att
 
 omeys Fees Pursuant To 11 U.S.C. 362(h).”
 
 (emphasis added).
 

 More fundamentally, the bank’s contention that it asked the bankruptcy court to postpone the damages hearing because it was not prepared for that aspect of the case is not supported by the record. The transcript merely shows that, when it appeared that the court was going to find the bank in contempt of the automatic stay, the bank’s counsel asked the court to postpone the hearing because counsel was appearing at that time as a replacement for the attorney who had actually been handling the matter. The bank’s attorney never stated
 
 *499
 
 that he was unprepared to litigate the damages issue because adequate notice had not been afforded. The reason he gave for requesting the postponement was so that the bank could obtain the testimony of bank personnel regarding the issue of whether the bank received proper notice of the automatic stay. On the bank’s claim that it did not have notice that the bankruptcy court would conduct a hearing on the issue of damages, the record clearly supports the finding of the bankruptcy court.
 

 Accordingly, it was proper for the bankruptcy court to conduct a hearing on damages immediately after having decided the contempt issue. On the amount of damages awarded by the bankruptcy court, however, we reluctantly find the court’s conclusion to be erroneous.
 

 The bank contends that the bankruptcy court erred in awarding damages for the loss of breeding and training contracts because there was no proof that the claimed losses were caused by the bank’s violation of the automatic stay order. The bank also argues that the amount of damages awarded was excessive because the evidence offered to support the award was speculative. We agree with both of these contentions.
 

 Under 11 U.S.C. § 362(h), “[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys’ fees, and, in appropriate circumstances, may recover punitive damages." A bankruptcy court’s decision with respect to the amount of damages constitutes a factual finding, and, under Bankruptcy Rule 8013, we may not upset such findings unless they are “clearly erroneous.” “ ‘A finding is “clearly erroneous” when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’ ”
 
 Anderson v. Bessemer City,
 
 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985),
 
 (quoting United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746,
 
 reh’g denied,
 
 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948)). Although we may not reverse the bankruptcy court’s damage award merely because we might have reached a different result,
 
 id.,
 
 “a damage award must not be based on ‘mere speculation, guess, or conjecture.’ ”
 
 John E. Green Plumbing & Heating Co. v. Turner Construction Co.,
 
 742 F.2d 965, 968 (6th Cir.1984),
 
 cert. denied
 
 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985),
 
 (quoting Zivin Laboratories Int v. Mead-Johnson & Co.
 
 208 F.Supp. 633 (E.D.Mich.1962). And, while “[w]e recognize that ‘the law does not require impossibilities’ when it comes to proof of damages, ... it does require whatever degree of certainty tha(t) the nature of the case admits.’ ”
 
 Id. (quoting Schankin v. Buskirk,
 
 354 Mich. 490, 497, 93 N.W.2d 293 (1958)).
 

 As we said, the bankruptcy court awarded actual damages for ten lost breeding contracts at $950 each and nine lost training contracts at $300 per month for twelve months. Here, where the acts which constitute the violation occurred at specific, identifiable times and where the victim is a business which presumably keeps accurate records, the proof of damages should be relatively specific and certain. After reviewing the record, however, we are convinced that the bankruptcy court’s award of actual damages was erroneous because it was based on speculative evidence and mere conjecture.
 

 The speculative nature of the evidence is readily apparent upon reviewing the transcript of the hearing. Mr. Archer initially testified that he lost eighteen breeding contracts at $1200 each and nine training contracts at $300 per month. In response to questions from the bank’s attorney, however, he could only account for ten lost breeding contracts and three lost training contracts; Archer stated that he would not know about the other claimed cancellations until later in the season. Moreover, of the ten breeding contracts which Archer could ascribe to specific expected clients, only five of those contracts were corroborated by other evidence in the record: Susan Lammertz testified that she cancelled two breeding reservations and William Kettle-
 
 *500
 
 well’s affidavit stated that he cancelled three planned breedings. The bankruptcy court, however, apparently chose to award actual damages in an amount greater than that which was supported by credible evidence because of the testimony that Mr. Archer’s business reputation had been injured. Increasing an award of actual damages on the basis of such vague speculation is improper.
 
 [1]
 

 The award is also based on undue conjecture in that the Archers failed to offer adequate proof that the claimed losses were caused by the bank’s misconduct. When asked about a causal connection between the publications of the foreclosure notice and the reduction in his business, Mr. Archer responded that it was a “very, very good possibility” that the cancellations were due to the bank’s advertisements; he had nothing to offer other than this conclusory opinion. Moreover, although Ms. Lammertz and Mr. Kettlewell stated that their decisions to cancel their planned dealings with the Archers were caused by their having observed the foreclosure notices, a reading of their testimony reveals that their actions were motivated by fears of getting entangled in the Archers’ legal difficulties. Given that both Ms. Lammertz and Mr. Kettlewell were very familiar with the Archers’ business, we find it unlikely that the publications of the foreclosure notice themselves, as opposed to the substance of the Archers’ insolvency, actually caused them to alter their respective plans. Finally, in splitting the difference between the losses claimed by the Archers and the damages actually proven, the bankruptcy court reasoned that the decline in the Archers’ “bookings” must have been caused by the bank’s misconduct because the decline in business occurred at the same time the foreclosure notices were appearing in the paper. Because it is just as likely, if not more so, that the Archers’ losses at that time were caused both by the same factors which led to their financial problems in the first place and by the existence of impending bankruptcy proceedings, the bankruptcy’s court’s conclusion is highly conjectural.
 

 On remand, the bankruptcy court should conduct a new hearing, but only on the issue of damages as the bank has not challenged the court’s conclusion that it willfully violated the automatic stay. This hearing should be conducted after adequate notice has been afforded to both parties.
 
 [2]
 
 Following this hearing, the bankruptcy court, bearing in mind that “11 U.S.C. § 362(h) requires a finding of actual injury,”
 
 In re Freunscht,
 
 53 B.R. 110, 113 (Bankr.D.Ver.1985), should award actual damages for the amount of losses suffered by the Archers as a result of the bank’s misconduct. If the bankruptcy court believes that the amount of such actual damages is insufficient to deter the kind of deliberate and repeated violations of the automatic stay which are evident in this ease, the bankruptcy court is free to impose an appropriate amount of punitive damages. We leave that to the bankruptcy court’s discretion.
 

 
 *501
 
 The bankruptcy court’s decision is hereby reversed, and the case is remanded for further proceedings consistent with our instructions.
 

 [1]
 

 . The speculative nature of the bankruptcy court’s decision is also evident in the court's choice of $950 for each lost breeding contract and of twelve months for each training contract. There is no evidence in the record to support the conclusion that training contracts, on average, extend for twelve months. Similarly, during the final stages of the hearing, the court recognized that there was no "guide" for choosing the fee which Archer would have received for each breeding contract he claimed to have lost.
 

 [2]
 

 . Although we found no procedural due process violation here, we believe that reversal in this case might have been avoided had the bankruptcy court postponed the damages portion of the hearing until both parties were better prepared. All of the players involved acknowledged that the proceedings were too hasty: as previously discussed, the bank asked to delay the entire hearing; Archer's attorney, who filed the motion to show cause and requested that damages be awarded, ironically explained that the reason he could not provide more support for the damages being claimed was because "[w]e didn’t have a lot of time to get all of [the witnesses we needed];” and the court itself recognized that the matter came before it "in a bit of a rush." We find it peculiar that the bankruptcy court postponed the hearing on the issue of attorneys’ fees, which ultimately amounted to only $1,942.50, and yet did not delay the hearing on actual damages, which amounted to over $41,-000.